201 P.3d 407 (2009)
MOWAT CONSTRUCTION COMPANY, Appellant,
v.
DEPARTMENT OF LABOR AND INDUSTRIES of the State of Washington, Respondent.
No. 60765-1-I.
Court of Appeals of Washington, Division 1.
February 23, 2009.
*408 Aaron Kazuo Owada, AMS Law PC, Lacey, WA, for Appellant.
John R. Wasberg, Office of the Attorney General, Seattle, WA, Bourtai Hargrove, Attorney at Law, Olympia, WA, for Respondent.
*409 BECKER, J.
¶ 1 The Department of Labor and Industries cited Mowat Construction Company for allowing employee noise exposure at a project site above the freeway to exceed permissible levels. Mowat contends the Department did not prove there were feasible engineering controls to reduce the noise. Mowat also argues that the employees' use of earplugs reduced the risk so as to take the violation out of the "serious" category. We affirm.
¶ 2 Mowat Construction's project was to erect a cement sound wall above Interstate 5 in Seattle in the Capitol Hill area. The purpose of the wall was to reduce the freeway noise coming up into the neighborhoods above the freeway. The sound wall they were working on at the time the citation was issued was designed to have 73 panels, each about 12.5 feet long. Mowat's work involved pouring grout into tubes that extended 10 feet or more into the ground at the base of, and on both sides of, the sound wall.
¶ 3 The Department of Labor and Industries is granted the authority to promulgate regulations under the Washington Industrial Safety and Health Act (WISHA) and to impose citations and penalties against employers for violating the regulations. RCW ch. 49.17. One specific rule provides that an employer must: "Reduce employee noise exposure, using feasible controls, wherever exposure equals or exceeds 90 dBA TWA8". WAC 296-817-20010. The rule states, "Controls that eliminate noise at the source or establish a permanent barrier to noise are typically more reliable." Specific examples are given, including replacing noisy equipment with quiet equipment and using silencers and mufflers. WAC 296-817-20010.
¶ 4 Michele Czajka is a compliance officer with the Department of Labor and Industries. She began an inspection of the Mowat worksite on April 20, 2005. Using a dosimeter, she determined that several different spots on the site were being exposed to noise levels above the limit. She arranged to return at a later date to conduct full shift monitoring.
¶ 5 Czajka returned on May 9, 2005 and again took measurements. It is undisputed that Czajka's measurements showed that several workers were exposed to noise above the 90 dBA limit.
¶ 6 The Department cited Mowat for a serious violation of WAC 296-817-20010. The Board of Industrial Insurance Appeals affirmed the citation. The Board's decision was affirmed on judicial review. Mowat appeals to this court.

SUFFICIENCY OF EVIDENCE
¶ 7 The Department bears the initial burden to prove a violation. WAC 263-12-115(2)(b). To prove a violation of a specific health and safety standard, the Department must prove (1) the cited standard applies; (2) the requirements of the standard were not met; (3) employees were exposed to, or had access to, the violative condition; and (4) the employer knew, or through the exercise of reasonable diligence could have known, of the violative condition. SuperValu, Inc. v. Dep't of Labor & Indus., 158 Wash.2d 422, 433, 144 P.3d 1160 (2006). According to the Department, the Board of Industrial Insurance Appeals has ruled that the Department is generally not required to prove that compliance with a specific standard is feasible; infeasibility is an affirmative defense. See In re Longview Fibre Co., No. 98 W0524 at 6 (Wash. Bd. Of Indus. Ins. Appeals Oct. 27, 2000). Under WAC 296-817-20010, however, there is no violation unless the employer can reduce the noise level by "using feasible controls". Accordingly, the Department acknowledges that in this case proving the availability of feasible noise controls was part of its initial burden.
¶ 8 At the Board hearing, the Department presented the testimony of Czajka to carry its burden of proving the violation. The Board found the elements of the violation to be established. In particular, the Board found that Mowat failed to use feasible controls:
On May 9, 2005, Mowat Construction Company failed to implement feasible controls where noise exceeded 90 dBA, for a time-weighted average of eight hours during grout pouring operations at its construction *410 site at Harvard and Roanoke Streets in Seattle, Washington.
Finding of fact 2. Mowat contends this finding is not supported by substantial evidence.
¶ 9 This court reviews a decision by the Board directly, based on the record before the agency. We review findings of fact to determine whether they are supported by substantial evidence. The findings of fact are conclusive if supported by substantial evidence when viewed in light of the record as a whole. RCW 49.17.150(1); RCW 34.05.570(3)(e). Substantial evidence is evidence in sufficient quantum to persuade a fair-minded person of the truth of the declared premise. J.E. Dunn Northwest, Inc. v. Dep't of Labor & Indus., 139 Wash.App. 35, 42-43, 156 P.3d 250 (2007).
¶ 10 On May 9, the workers were filling the tubes with grout that came from a cement mixer truck positioned close to the sound wall. They would fill a 55-gallon drum with grout from the mixer and elevate the drum on a forklift. Also on the forklift was a generator which was used to power an instrument called a vibrator. The workers were within a few feet of the generator. The vibrator would be put inside the drum so that the grout would not solidify too quickly. Then the grout would be poured from the drum into the tubes. It was a mobile operation. As the tubes at the base of one of the sound wall panels were filled, the forklift and crew would move on to the tubes at the base of the next panel.
¶ 11 Czajka testified that she identified four sources of noise on May 9: the idling forklift, the vibrator, the generator, and freeway traffic. It is undisputed that the noise from the freeway was significant.
¶ 12 Czajka testified that during her inspection on May 9, she placed noise monitors on four employees. She checked the monitors throughout the day. They consistently showed average levels above 90 dBA for the three employees who were working close to the pour. She told the foreman that controls needed to be implemented to reduce the noise levels.
¶ 13 The record shows that as a result of Czajka's discussion with the foreman in the late afternoon of May 9, the workers began to pour the grout from the mixer directly into the tubes. The vibrator was still used, but inserted directly into the tube, not placed in the drum. The forklift was no longer in use. The generator was taken off the forklift and moved some distance away. The new configuration could be used for half the pours, those done on the east side of the wall. As a result of the change, Czajka testified, the noise levels decreased:
[Assistant Attorney General]: On what basis do you say that there was a decrease in the noise level after the equipment positions were changed?
[Czajka]: There is a double reasoning. The first is I took sound level measurements near the equipment during this process. The mixer truck during the pour was measuring at 82 dBA approximately five feet from the truck. The concrete vibrator placed directly in the poured concrete was running at 88 dBA approximately five feet from the operation. These levels are lower than those of the forklift and the generator alone, as well as the forklift, generator, and concrete vibrator together.
The second would be looking at the graphed charts from the sound level monitoring, which show in two instances a decrease in the sound levels in the last hour of the operation when this operation was involved.
¶ 14 According to Czajka, there were two other options for reducing the noise even without changing the basic operation. First, the generator could have simply been moved off of the forklift, eliminating the metal against metal vibration. Second, the area could have been dampened by use of an inexpensive sound blanket "so you would have less of a vibration on vibration noise source."
¶ 15 The Department contends that Czajka's testimony carried the Department's burden by demonstrating that the changes to Mowat's operation were feasible and that once made, they substantially reduced the noise generated by operation of the equipment. Mowat, however, contends the record shows that the noise from the freeway was so *411 great at the worksite that reducing noise generated by the equipment had virtually no effect upon the total amount of noise to which the workers were exposed. Mowat also contends the evidence fails to show that moving the generator actually reduced the noise generated by the equipment.
¶ 16 When cross-examining Czajka, Mowat elicited her statement that she took no noise measurements to determine the actual noise level arising from the use of the generator. An expert witness who testified on behalf of Mowat talked about the logarithmic nature of sound measurement. He gave testimony casting doubt on the idea that moving the generator would actually reduce the noise exposure for the workers when the background noise from the freeway was so loud. Mowat argues that in light of such testimony, it is impossible to say that moving the generator some distance away actually had the effect of reducing the noise level.
¶ 17 The Board was not obligated to accept Mowat's evidence where it tended to contradict Czajka's. The Board acknowledged the expert testimony presented by Mowat, but based its decision instead on Czajka's measurements showing that "before the change in operation, the noise was louder than 90 decibels and that after the change it was not."
¶ 18 It appears from the record that Czajka may have been talking about the April 20 visit when she said she did not isolate the generator from the rest of the background noise. Her direct testimony about May 9 describes a specific effort to determine whether the equipment was increasing the noise above background traffic levels by measuring approximately 5 feet away from the forklift. She said she first found a level of 79.2 decibels when she checked with the forklift idling during the midday traffic. "When you added the generator to the forklift and midday traffic, the level rose to 89.2 decibels. When you added the concrete vibrator running at the same time as the forklift and the generator the level rose to 93.2 decibels." In any event, the Board summed up the evidence as follows as to May 9:
At a later point in the day, Mowat moved the generator off the forklift, and used a concrete mixer to pour cement directly into the forms. Another employee used the vibrator for a few minutes to settle the concrete, and they dispensed with the forklift altogether. Ms. Czajka then took noise level readings, which showed that the mixer truck during the pour was at 82 decibels about five feet away from the truck, and the concrete vibrator measured at 88 decibels about five feet away from the operation. This was less than the readings prior to the modifications.
¶ 19 The Board's statement is substantiated by Czajka's testimony, and it is a reasonable view of the evidence. This is not a case of a witness testifying in vague or conclusory terms without any supporting measurements.
¶ 20 Mowat also notes Czajka's admission that while she thought it would be feasible to use a sound blanket, she did not know what effect it would have on the generator. This admission does not undermine the Board's decision. The use of a sound blanket was another option identified by Czajka, but the Board based its decision on the actual change in operations at the end of the day.
¶ 21 Finally, Czajka testified the measurements she took on April 20, 2005 were above the 90 decibel level, and she admitted the generator was not in use on that date. According to Mowat, this testimony shows that the generator could not have been the cause of the elevated noise levels found during Czajka's investigation on May 9, 2005. That conclusion does not follow as a matter of logical necessity. There was no apples-to-apples comparison showing that all other things were equal on both days. The citation was for May 9, not April 20. To determine whether the Department made a prima facie case for a violation on May 9, we need look only to the measurements taken on May 9.
¶ 22 We conclude the record contains substantial evidence to support the Board's determination that Mowat failed to use feasible controls to reduce the noise level. To the extent Mowat is arguing that its affirmative defense of infeasibility should have carried the day, the same substantial evidence supports the Board's decision to reject that defense.

*412 SERIOUS VIOLATION
¶ 23 Mowat contends that even if the noise standard was violated, the violation should not have been classified as "serious". The standard for a "serious" violation is whether there is "a substantial probability that death or serious physical harm could result." RCW 49.17.180(6). Mowat does not dispute that persistent exposure to noise levels above the 90 decibel can result in permanent hearing loss, or that permanent hearing loss is serious physical harm. Mowat's argument is grounded on the evidence that the employees at the worksite were consistently wearing earplugs with a noise reduction rating of 33 dBA. According to Mowat, the use of the earplugs reduced the workers' actual noise exposure to a level within acceptable limits, so there was not a serious hazard.
¶ 24 The regulation at issue requires employers to reduce noise at the source, whether or not their employees wear hearing protection such as earplugs. "Separate requirements apply to hearing protection and are found in WAC 296-817-20015." WAC 296-817-20010. Hearing protection reduces the risk of hearing loss but does not eliminate it because earplugs are not always effective and may not always be worn. Thus, the regulation itself explains that hearing protection is not considered a control of the noise hazard. The failure to ensure that employees are wearing earplugs is a potential violation under a different regulation, WAC 296-817-20015.
¶ 25 Federal cases cited by Mowat do not support the argument that use of earplugs by employees makes a violation of the noise control regulation less serious. Mowat says the violation was not shown to have a "direct and immediate relationship to the employees' safety and health," a standard applied in federal cases to separate a more serious violation from one that is "de minimis". Lee Way Motor Freight v. Secretary of Labor, 511 F.2d 864, 867, 869 (10th Cir.1975). In Lee Way, an employer was cited for not having covers or guardrails for the maintenance pits at the worksite. The employer argued that the open pits could not be deemed a hazard because there had been no accidents, and therefore the violation should be classified as "de minimis". The court rejected this argument and held that it was not the government's burden to prove a hazard existed. "The standard presupposes the obvious, namely, that an open unguarded pit necessarily presents the hazard that someone may fall into it." Lee Way, 511 F.2d at 869; see also SuperValu, Inc., 158 Wash.2d at 434, 144 P.3d 1160 (citing Lee Way and stating that if the violation concerns a specific standard under WISHA, it is not necessary for the Department to prove that a hazard exists, just that the specific standard was violated). Affirming the citation, the court in Lee Way had no trouble finding a direct and immediate relationship to worker safety:
the Review Commission . . . determined that the hazard of someone tripping, slipping, or falling into the open service pit had a direct connection to employees' safety. In our view the record permits the drawing of such an inference, even though no one has yet fallen. One purpose of the [Occupational Safety and Health Act of 1970] is to prevent the first accident.
Lee Way, 511 F.2d at 869-70.
¶ 26 Similarly here, the hazard of hearing loss is presupposed by the standard itself. The Department is not required to prove, every time there is a citation for a serious violation, that exposure to loud noise causes hearing loss. Nor is the Department required to wait for someone to go deaf before citing the employer. What the Department must prove is the availability of feasible controls to curb the noise. It is the employer's failure to reduce noise below 90 decibels where feasible that causes a substantial probability of serious physical harm. That element of proof of a serious violation was met here.
¶ 27 Mowat also argues that the violation was not serious because the protection provided by the earplugs was, in the words of Phoenix Roofing, Inc. v. Dole, 874 F.2d 1027, 1032 (5th Cir.1989), "equal to or greater than that imposed by regulation." Phoenix concerned a federal fall-protection requirement for use of a safety net or warning lines on a roof worksite more than 50 feet wide. The employer instead used safety monitors, a system approved only for narrower roofs. The *413 employer was able to show that under the circumstances, the use of monitors provided at least the same protection which the workers in question would have received if there had been a warning line in place. The court agreed and classified the violation as de minimis rather than serious. Because the employer used more effective protection than the standard called for, the employer's technical violation of the standard did not create an "additional hazard." Phoenix, 874 F.2d at 1034. Unlike in Phoenix, Mowat's operation did create an additional hazard to worker safety which would not have existed absent the violation. And the regulation itself spells out that the use of earplugs is not to be considered the functional equivalent of noise control at the source.
¶ 28 Whether a violation is serious under WISHA depends on whether there is a "substantial probability that death or serious physical harm could result". RCW 49.17.180(6). We have already decided that "substantial probability" does not refer to the probability that harm will occur on a particular worksite. Instead, what it refers to is "the likelihood that, should harm result from the violation, that harm could be death or serious physical harm." Lee Cook Trucking & Logging v. Dept. of Labor and Industries, 109 Wash.App. 471, 482, 36 P.3d 558 (2001). Although using earplugs may make it less likely that an employee will suffer harm as a result of exposure to excessive noise, the violation is still serious because if the violation of noise standards does cause harm, there is a substantial probability that the nature of the harm will be permanent hearing loss.
¶ 29 We conclude the Board did not err in affirming the citation as a serious violation.
¶ 30 Affirmed.
WE CONCUR: ELLINGTON and COX, JJ.