

2014 JUL -7 AM 9: 47

IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | | |
|---|---|---|
| BN BUILDERS, INC., a Washington corporation, | ) ) ) | No. 70142-8-I |
| Appellant, | ) ) ) | DIVISION ONE |
| v. | ) ) | |
| DEPARTMENT OF LABOR AND INDUSTRIES AND BOARD OF INDUSTRIAL INSURANCE APPEALS, | ) ) ) | UNPUBLISHED OPINION FILED: July 7, 2014 |
| Respondent | ) ) ) | |

LEACH, J. — BN Builders Inc. (BNB) appeals a superior court judgment affirming the decision of the Board of Industrial Insurance Appeals (Board) involving Department of Labor & Industries (Department) citations for asbestos workplace violations. BNB contends that substantial evidence does not support the Board's findings and that the Board applied an inappropriate strict liability standard. BNB also disputes the assessed penalties, which the Department increased because of a "poor" rating for good faith. Because substantial evidence in the record supports the Board's findings and those findings support the Board's conclusions of law, we affirm.

FACTS

In late December 2009, BNB began work as the general contractor to convert a former hospital into a private school. The original building dates from the 1920s, with an additional wing added in 1945. Federal and state law required BNB to obtain a good faith survey to assess the presence of asbestos before beginning demolition work.[1]

The property owner gave BNB a survey that Earth Consulting Inc. (ECI) conducted in 2007. This survey analyzed 87 samples and found asbestos-containing material (ACM) in vinyl floor tiles, tile and carpet mastic, cement asbestos board, pipe lagging, tank and water heater insulation, and asphaltic roofing materials. The ECI survey report noted that it did not address ACM that might be located "behind walls and/or columns, beneath flooring, above non-removable ceilings, underground, or in any other inaccessible areas," and stated, "Should suspected ACM be uncovered during demolition activities, it should be sampled, tested, and characterized at that time." The property owner also gave BNB a 2008 inspection report from Argus Pacific Inc. This inspection analyzed samples for other possible contaminants, including lead, mercury, metals, radiation, and mold. The Argus Pacific inspection also identified but did not analyze "a large number of suspect asbestos-containing materials that were not sampled and analyzed during the previous asbestos inspection." Argus Pacific

---

[1] 40 CFR § 763.86; WAC 296-62-07721(1)(c)(ii).

No. 70142-8-I/3

recommended that the property owner commission a "more thorough asbestos inspection" before demolition.

Before beginning its work, BNB solicited bids for a new asbestos survey. After two consultants recommended that "a quality abatement contractor would be money better spent," BNB decided to rely on the 2007 ECI asbestos assessment and not commission another survey. BNB was not a certified asbestos contractor, and BNB's contract with the property owner expressly excluded abatement or removal of hazardous materials. When BNB started work on December 28, 2009, it had not yet hired an abatement contractor.

BNB performed a "soft demolition": removal of nonstructural portions of the building. Demolition areas included some not shown as tested in the ECI survey. As BNB workers removed carpet, they sometimes also removed old vinyl tiles that stuck to the carpet. Some of these tiles broke during removal. BNB foreman Robert Voss instructed workers to throw carpet free of tiles directly into the dumpster. For carpet containing tile or mastic, Voss directed workers to wrap the materials in plastic bags, secure the bags with duct tape, and place them in a designated room for asbestos abatement contractors to pick up later. Workers did not wear protective clothing or use respirators for most or all of the work. In the course of the work, workers sometimes also disturbed thermal system insulation. On January 11, 2010, worker Jeff Pennington completed a "near miss" incident report describing insulation that fell on him from a wall he was demolishing. He wrote, "I had seen it befor[e] but didn't know if it contained asbestos or not. I

-3-

asked Bob Voss he said it has been tested but the results weren't in yet. WORK IN THAT AREA WAS HALTED!" At least two BNB workers expressed their concerns about asbestos exposure to managers. These managers were on site during several days of demolition.

On January 12, 2010, worker Stewart Weston contacted the Department, which conducted an inspection the next day. Based on her observations and belief that previous surveys had "serious flaws," inspector Janine Rees directed BNB to obtain another asbestos survey. Subsequent testing by NVL Laboratories Inc. revealed asbestos in a number of materials, including pipe insulation and vinyl floor tiles of varying sizes and colors.

The Department issued a citation to BNB for ten serious and three general violations, with a total penalty of $19,300.[2] Twelve of the violations involved

_____

[2] Specifically, the citation alleged that BNB did not use critical barriers to isolate the class II removal of presumed asbestos containing vinyl flooring and mastic or have a negative exposure assessment for the work, in violation of WAC 296-62-07712(9)(b)(i); did not conduct asbestos air monitoring during removal or air clearance monitoring after removal of vinyl flooring and mastic, in violation of WAC 296-62-07709(3)(a)(ii) and -07709(3)(h); did not ensure the use of full body protective clothing during asbestos removal, which is required in the absence of a negative exposure assessment, in violation of WAC 296-62-07717(1); removed asbestos in a dry state without the use of supplied air respirators rather than in a wet, saturated state, in violation of WAC 296-62-07712(2)(c) and -07715(4)(a)(ii); did not use certified asbestos workers or obtain certification as a certified asbestos contractor before conducting a class II asbestos abatement project, in violation of WAC 296-62-07722(3)(b)(i)(A) and 296-65-030(1); did not obtain an asbestos survey identifying all asbestos containing materials on the site before starting work, in violation of WAC 296-62-07721(2)(e); did not promptly encapsulate or clean up presumed asbestos thermal system insulation damaged by employees during interior wall demolition, in violation of WAC 296-62-07712(2)(d), -07723(8), or -07723(2); did not conduct preabatement asbestos air monitoring before removing presumed asbestos containing vinyl floor tile and mastic, in violation of

asbestos removal procedures, and one cited an inadequate respirator program. The Department gave BNB a "poor" rating for good faith, which increased the penalties for ten of the violations. BNB appealed the citations, and an industrial appeals judge affirmed. BNB then petitioned the Board of Industrial Appeals, which affirmed nine of the serious violations and all three general violations, imposing a judgment against BNB of $16,800.[3] BNB appealed to King County Superior Court, which affirmed the Board's decision.

BNB appeals.

## STANDARD OF REVIEW

The Washington Industrial Safety and Health Act of 1973 (WISHA), chapter 49.17 RCW, governs judicial review of a decision issued by the Board.[4] This court directly reviews the Board's decision based on the record before the agency.[5] The Board's findings of fact are conclusive if they are supported by substantial evidence when viewed in light of the record as a whole.[6] Substantial evidence is evidence sufficient to persuade a fair-minded person of the truth of the matter

WAC 296-62-07709(3)(g); did not file with the Department a notice of intent to remove asbestos abatement project before conducting a class II asbestos abatement project, in violation of WAC 296-65-020(1)(e); and did not maintain an adequate respirator protection program, in violation of WAC 296-842-12005(1).

[3] The Board reversed violation 1-8, in which the Department found that "Before starting work on site, the employer did not obtain an asbestos survey to determine if all materials to be worked on, or removed, contain asbestos."

[4] RCW 49.17.140.150(1).

[5] Mowat Constr. Co. v. Dep't of Labor & Indus., 148 Wn. App. 920, 925, 201 P.3d 407 (2009).

[6] RCW 49.17.150(1); Mowat, 148 Wn. App. at 925.

asserted.[7] If this court determines that substantial evidence supports the Board's findings, it then decides if those findings support the Board's conclusions of law.[8]

This court reviews the Board's interpretation of a statute or regulation de novo, under an error of law standard.[9] This court gives "substantial weight" to the agency's interpretation of regulations within its area of expertise and will uphold that interpretation if "'it reflects a plausible construction of the language of the statute and is not contrary to the legislative intent.'"[10] This court reviews WISHA penalty amounts for abuse of discretion.[11] A court abuses its discretion where its decision is arbitrary or rests on untenable grounds or reasons.[12]

## ANALYSIS

### WISHA and Asbestos

The legislature enacted WISHA "to assure, insofar as may reasonably be possible, safe and healthful working conditions for every man and woman working in the state of Washington."[13] In RCW 49.26.010, the legislature recognized the dangers of exposure to asbestos, which is "known to produce irreversible lung damage and bronchogenic carcinoma. . . . The nature of this problem is such as to

[7] Mowat, 148 Wn. App. at 925.

[8] J.E. Dunn Nw. Inc. v. Dep't of Labor & Indus., 139 Wn. App. 35, 42, 156 P.3d 250 (2007).

[9] Roller v. Dep't of Labor & Indus., 128 Wn. App. 922, 926, 117 P.3d 385 (2005).

[10] Cobra Roofing Serv., Inc. v. Dep't of Labor & Indus., 122 Wn. App. 402, 409, 97 P.3d 17 (2004) (quoting Seatoma Convalescent Ctr. v. Dep't of Soc. & Health Serv., 82 Wn. App. 495, 518, 919 P.2d 602 (1996)).

[11] Danzer v. Dep't of Labor & Indus., 104 Wn. App. 307, 326, 16 P.3d 35 (2000).

[12] Danzer, 104 Wn. App. at 326.

[13] RCW 49.17.010.

constitute a hazard to the public health and safety, and should be brought under appropriate regulation." The legislature established a comprehensive statutory regime to regulate asbestos, and the Department promulgates and enforces rules for all occupational exposure to asbestos in workplaces that WISHA covers.[14]

The regulations define "ACM" as any material containing more than one percent asbestos.[15] When friable thermal system insulation crumbles or flooring materials break during demolition, asbestos fibers may be released into the air. In buildings constructed before 1980, vinyl and asphalt flooring materials are presumed to contain asbestos.[16] Friable thermal system insulation is also presumed to contain asbestos.[17] To ensure proper identification and abatement of ACM, an owner or agent must perform a good faith inspection for ACM before any construction, renovation, remodeling, or demolition that may disturb and expose workers to asbestos.[18] An employer may rebut the presumption of asbestos by producing a report by an industrial hygienist who has used "recognized analytical techniques" showing that the material is asbestos-free.[19] Removal of broken asbestos-containing vinyl floor tile is a class II asbestos project, requiring the use of certified asbestos workers.[20]

---

[14] RCW 49.26; WAC 296-62-077 to -0755; WAC 296-65-001 to -050.

[15] WAC 296-62-07703.

[16] WAC 296-62-07712(10)(a)(ix); WAC 296-62-07721(1)(b).

[17] WAC 296-62-07712(12)(b).

[18] RCW 49.26.013(1); WAC 296-62-07721(2)(b)(ii); Prezant Assocs., Inc. v. Dep't of Labor & Indus., 141 Wn. App. 1, 8, 165 P.3d 12 (2007).

[19] WAC 296-62-07712(10)(a)(ix).

[20] WAC 296-62-07703, -07722(3)(b)(i)(B). Class II asbestos work involving intact materials or less than one square foot of ACM is not considered an asbestos

RCW 49.17.180 divides civil violations of WISHA into three categories: willful or repeat, serious, and not serious. The Department cited BNB for 10 serious violations, which exist where

> a substantial probability that death or serious physical harm could result from a condition which exists, or from one or more practices, means, methods, operations, or processes which have been adopted or are in use in such workplace, unless the employer did not, and could not with the exercise of reasonable diligence, know of the presence of the violation.[21]

To prove a violation of a specific health and safety standard, the Department must prove (1) the cited standard applies, (2) the employer did not meet the requirements of the standard, (3) employees were exposed to the violative condition, (4) "'the employer knew or, through the exercise of reasonable diligence, could have known of the violative condition,'" and (5) there is a substantial probability that death or serious injury could result from the violative condition.[22] "[C]onstructive knowledge is sufficient to prove knowledge of the violative condition."[23] The Department may establish constructive knowledge of a WISHA violation in a number of ways, including with evidence showing that the violation was readily observable or in a conspicuous location in the area where the employees were working.[24] "'Reasonable diligence involves several factors,

---

project and does not require asbestos worker certification.   WAC 296-62-07722(3)(b)(ii)(A)–(B).

[21] RCW 49.17.180(6).

[22] Wash. Cedar & Supply Co. v. Dep't of Labor & Indus., 119 Wn. App. 906, 914, 83 P.3d 1012 (2003) (quoting D.A. Collins Constr. Co. v. Sec'y of Labor, 117 F.3d 691, 694 (2d Cir. 1997)).

[23] BD Roofing, Inc. v. Dep't of Labor & Indus., 139 Wn. App. 98, 109, 161 P.3d 387 (2007).

[24] BD Roofing, 139 Wn. App. at 109-10.

including an employer's obligation to inspect the work area, to anticipate hazards to which employees may be exposed, and to take measures to prevent the occurrence."[25]

BNB's Knowledge of the Violative Condition

BNB challenges the Department's proof of the fourth element, arguing that BNB exercised reasonable diligence by obtaining and relying on ECI's survey and could not have known of the presence of asbestos at the site. BNB contends that the Board's decision to reverse violation 1-8, "the employer did not obtain an asbestos survey to determine if all materials to be worked on, or removed, contain asbestos," supports its argument that it exercised reasonable diligence. As BNB frames the issue, the Board improperly penalized it for reasonably relying on a good faith survey and "inappropriately applied a strict liability standard" to reach a decision that "defies common sense and construction industry practice."[26]

BNB mischaracterizes the issue. The Board did not sanction BNB for its initial reliance upon its good faith survey. Instead, the Board sanctioned BNB because, as a result of its work, it later "knew or, through the exercise of reasonable diligence, could have known" of the hazardous conditions that the survey did not reveal. In its findings of fact, the Board found that "[t]he employer did not take measures to protect employees as soon as it had reason to suspect

---

[25] Erection Co. v. Dep't of Labor & Indus., 160 Wn. App. 194, 206-07, 248 P.3d 1085 (2011) (internal quotation marks omitted) (quoting Kokosing Constr. Co. v. Occupational Safety & Hazard Review Comm'n, 232 Fed. Appx. 510, 512 (6th Cir. 2007)).

[26] In an amicus brief, the Associated General Contractors of Washington makes a similar argument.

employees were working with asbestos-containing material." Substantial evidence supports these findings. Voss appeared to treat the vinyl tiles pulled up with carpet as ACM when he ordered that they be double-bagged, sealed, and segregated from other waste. Rees testified that when she interviewed Voss, "He told me that he suspected there might be asbestos in the mastic; and that it was only two percent, and he wasn't concerned about it because it was nonfriable." BNB worker Stewart Weston also testified that Voss told him some of the tile mastic contained asbestos. He testified that he and several other employees brought their concerns about asbestos to Voss "right away."

On December 31, 2009, Casey Blake, BNB general superintendent for the jobsite, told Voss that "we needed to stop carpet removal until an abatement crew is on site." BNB safety director Bruce Campbell testified in a deposition, "As soon as the tile started coming up with the carpet they should have stopped work." Blake's notes about January 11 also describe a conversation with Weston about Weston's concerns and reference "a lot of concerned people . . . [we] decided to have a quick meeting with the guys and tell them by no way do we want people exposed to hazards." On that day, Blake also asked Voss "to have the abatement crew look at the [presumed] ACM we found as well and I learned we did not have one signed up yet." A BNB "Weekly Safety Review" dated January 9, 2010, noted that at the site, "[a]sbestos floor tiles that come up when carpet is removed need to be replaced or set aside in a sealed bag for the abatement contractor. Took

-10-

additional samples to lab for possible asbestos. Samples were not listed on the Good Faith Survey."

BNB challenges the Board's finding that BNB "did not take measures to protect employees as soon as it had reason to suspect employees were working with asbestos-containing material," asserting, "The correct legal standard is 'knowledge,' not 'suspicion.'" But the fact that the Board's finding did not use the precise statutory language does not prevent us from affirming the Board's decision. Substantial evidence supports the Board's finding that BNB had constructive knowledge of the violative condition under RCW 49.17.180(6).

The Board found that BNB "obtained an asbestos survey adequate to determine if the materials to be demolished contained asbestos." BNB infers from this that "the Board concluded that an adequate [survey] had been obtained," and "the Board found BNB had been reasonably diligent and reasonably believed it was following the [survey] and the promulgated standard." However, BNB was not entitled to rely only on this survey for the duration of its work, ignoring readily observable conditions discovered at the jobsite demonstrating workers' exposure to asbestos. Despite evidence that contradicted the ECI survey, BNB did not "'anticipate hazards to which employees may be exposed,'" or "'take measures to prevent the occurrence.'"[27] Substantial evidence shows that BNB could have protected its workers from asbestos exposure through the exercise of reasonable diligence.

_____

[27] Erection Co., 160 Wn. App. at 206-07 (quoting Kokosing, 232 Fed. Appx. At 512).

-11-

## Failure to Dispose of Wastes

BNB also challenges violation 1-9, which sanctioned BNB for its failure to ensure "[p]rompt cleanup and disposal of wastes and debris contaminated with asbestos in leak-tight containers." BNB argues that (1) there was no evidence that BNB created or was aware of the debris and (2) because BNB is not a certified asbestos contractor, such cleanup was beyond the scope of its work. BNB contends, "It is inconsistent for the Department to cite BNB for failing to engage in the clean up operations for asbestos, when BNB was never certified to engage in such activities." However, BNB's lack of certification and the limitations of its contract do not excuse workers' exposure to "chunks of fluffy, dry friable asbestos pipe insulation," which Rees found "dropped on the floor" during her inspection. Moreover, BNB did not dispute that for nearly two weeks, workers demolished carpet and broken floor tiles without air monitoring, protective clothing, respirators, critical barriers, or wet saturation removal. At the end of that time, BNB had still not engaged an abatement contractor. The record contains substantial evidence showing that BNB failed to clean up debris contaminated with asbestos.

## Written Respirator Program

BNB argues next that substantial evidence does not support the Department's citation for violation 2-3, in which the Department found that BNB's written respirator program was deficient. The Department cited BNB for "not list[ing] specific respirators to be used for each type of hazard, such as lead, silica,

asbestos or dusts. The program is generic in nature and must be tailored to the employer's workplace and hazards found on the work site."

WAC 296-842-12005(1) requires that employers "[d]evelop a complete worksite-specific written respiratory protection program" that includes a list of required elements related to respirator selection and use, medical evaluation, fit-test procedures, and training. BNB did not present a worksite-specific respirator program. "Pre-activity hazard analysis" forms in the record identify hazards such as lead and note the need for personal protective equipment. But neither the respirator program nor the hazard analysis forms specify "the appropriate respirator for each respiratory hazard in your workplace,"[28] as required by the applicable regulation. Substantial evidence supports the Board's finding that BNB's written respirator program was deficient.

Penalties

Finally, BNB argues the Board erred by affirming penalties that the Department increased because of a "poor" rating for good faith. The Department may adjust a base penalty using several factors, including "good faith effort."[29] A "poor" rating for good faith results in a 20 percent increase in the base penalty.[30] To determine good faith, the Board considers if the employer "(1) took prompt action to understand and comply with the regulation, (2) cooperated with the investigation, (3) worked with the Department to resolve the problem, and (4)

---

[28] WAC 296-842-12005 (Table 3).
[29] WAC 296-900-14015 (Table 5).
[30] WAC 296-900-14015 (Table 5).

appeared committed to assuring a safe and healthful workplace."[31] Conscious disregard of risks, delay in correcting the violation, deceptive behavior, and willful resistance to compliance indicate a lack of good faith.[32]

Rees testified that "a variety of factors" contributed to her good faith rating, including "incorrect or evasive information" from management:

> Mr. Voss told me the workers were wearing respirators during the removal of the floor tile. Later on when I interviewed him in BNBuilders office, he admitted that the respirators weren't provided until the very end. Mr. Voss stated that Pete Campbell took the—some of the supplemental asbestos samples during the course of the work, and that he was an accredited inspector. Later on Mr. Voss admitted that he was the one who took the samples, not Mr. Campbell, and Mr. Campbell was not accredited at the time. Mr. Voss completely misrepresented the amount of tile that was removed by workers from BNBuilders, which he corrected much later. So information was not candid and forthright at the outset of the inspection. When I contained [sic] information that contradicted what I had been told by management from multiple sources, I confronted them, and then they did admit the truth. But BNBuilders, you know, was not particularly cooperative in this inspection in providing truthful information.[33]

The substantial evidence standard "necessarily entails acceptance of the factfinder's views regarding the credibility of witnesses and the weight to be given reasonable but competing inferences."[34] Testimony in the record supports the Board's finding that BNB "failed to fully and completely disclose pertinent information during the inspection." Because the Department based its penalty calculation on the factors in RCW 49.17.180(7) and substantial evidence supports

---

[31] Danzer, 104 Wn. App. at 324.

[32] Danzer, 104 Wn. App. at 324.

[33] Voss denied at hearing that he told Rees he had taken any samples.

[34] State v. ex rel. Lige & Wm. B. Dickson Co. v. Pierce County, 65 Wn. App. 614, 618, 829 P.2d 217 (1992).

No. 70142-8-I/15

the calculations, the penalties are not arbitrary or based on untenable grounds.[35] The Department did not abuse its discretion.

CONCLUSION

Because substantial evidence in the record supports the Board's findings that BNB knew or could have known through reasonable diligence that its employees were exposed to asbestos, that BNB failed to properly clean up asbestos debris or maintain a written respirator program, and that the Department did not abuse its discretion by assessing a "poor" good faith rating, we affirm.

WE CONCUR:

---

[35] Danzer at 104 Wn. App. at 327.

-15-