

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

PERFORMANCE ABATEMENT
SERVICES, INC.,

        Appellant,

        v.

DEPARTMENT OF LABOR AND
INDUSTRIES,

        Respondent.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

DIVISION ONE

No. 70451-6-I

UNPUBLISHED OPINION

FILED: August 11, 2014

DWYER, J. — Performance Abatement Services, Inc. (PAS) challenges the

Board of Industrial Insurance Appeals' (Board) determination that it failed to

provide adequate hand washing facilities, and that this failure constituted a

serious violation of the Washington Industrial Safety and Health Act of 1973[1]

(WISHA). The Board's factual findings are supported by substantial evidence

and those findings adequately support the Board's determination. Accordingly,

we affirm.

I

PAS is a company that specializes in lead and asbestos removal. In

March 2011, PAS performed asbestos and lead abatement work at a three-story

building owned by Western Washington University. The building was formerly an

armory owned by the Washington National Guard. During the building's previous

---

[1] Ch. 49.17 RCW.

ownership, a portion of the basement was used as a shooting range.

Work in the shooting range consisted of bagging up and removing sand, which was littered with bullets. Due to the high amount of lead from the bullets, the shooting range was cordoned off. A three-stage showering area was set up outside the cordoned shooting range. The shooting range was only accessible through the showering area, and employees working on sand removal were required to take a shower upon leaving the shooting range.

The rest of the building contained much lower amounts of lead than the shooting range and was not similarly cordoned off. Work in the rest of the building consisted mainly of removing metal from a boiler and removing lead by scrubbing the walls with wire brushes and scraping them with a device referred to as a "five-in-one."

On March 17, 2011, Christian Bannick, an industrial hygienist with the Department of Labor and Industries (Department), conducted his first inspection of the work ongoing at the armory. Bannick later returned "at least a couple times following up with additional walkthroughs." Following the inspections, Bannick cited PAS for violation of Washington Administrative Code (WAC) 296-155-17619(5), requiring the provision of adequate hand washing facilities for employees exposed to lead.[2] Bannick proposed that the violation be classified as serious due to the potential health effects of lead exposure, including "impact on . . . the blood forming systems," "reproductive hazards," and "neurological

_____

[2] Bannick also cited PAS for violations of two other WAC provisions, neither of which are at issue on appeal.

- 2 -

damage."

An Industrial Appeals judge conducted a hearing on the citation. At the hearing, the judge heard testimony from Bannick and numerous PAS employees. These individuals testified as follows.

Arnoldo Cantu, a laborer with PAS, stated that employees would wash their hands in a tub connected to the showering area. The tub did not have running water; rather, it was filled in the morning and emptied at the end of the day. Cantu also stated that employees used the tub to clean their equipment.

Cantu testified that a separate washing station was located on the first floor of the armory. This station had a foot pump for running water, and was also equipped with soap and towels. Cantu could not recall if there was a washing facility on the second floor, but believed there was one.

The showers, as far as Cantu could recall, always had running water. Cantu used the showers whenever he exited the shooting range. However, he also stated that "sometimes you can't get enough water out of" the showers.

Mynor Arita, a former laborer with PAS, stated that employees washed their hands in a bucket of water or sometimes with a sprayer. Arita testified that the shower had no water.

Lauro Santiago, a laborer with PAS, stated that employees would use buckets filled with soap and water to wash their hands. These buckets were filled using water hoses. Santiago stated that he and other employees would also wash their hands using a "hotsy" sprayer. Water from the sprayer collected in a tub, and was later emptied by hand into a 55 gallon container.

Santiago testified that the shower functioned properly, and that he would use it every time he left the shooting range. Santiago stated that additional showers were set up in other parts of the building. According to Santiago, the armory was equipped with showers throughout the entire project.

Earnest Crane, a PAS employee who served as the foreman on the armory project, testified that he walked around the armory with Bannick during at least one inspection. Crane stated that Bannick told him "good job" after seeing a shower on site.

Crane further testified that there were two showering facilities in the basement: one for the shooting range and one for the rest of the basement. There was also a shower located on the second floor, located near the entrance to the building. Crane stated that the shower for the shooting range was fully operational on the day that laborers worked in the firing range. Crane observed the workers exit the shooting range shower and saw that all of them were wet. After work on the firing range was completed, the shower was relocated to the first floor.

The only hand washing facility Crane described at the hearing was "a three-stage shower with . . . a black tub that we use on jobs with a water hose ran inside of it," located on the second floor.

Gary Hansen, a branch safety supervisor for PAS, testified that he became involved with the armory project after Bannick's first inspection. During a subsequent inspection, Hansen observed the following interaction between Bannick and Crane:

> Mr. Bannick asked Mr. Crane if we had a hand wash station set up to do the lead work. Mr. Crane pointed at the shower that was set up in the hallway and said, "We have this shower set up." And to the best of my recollection, Mr. Bannick said, "That's even better."[3]

Hansen also testified that he observed "a set of buckets at the bottom of the stairwell" being used as a hand washing facility.

Bannick, the Department's inspector, stated that during one of his inspections, the foreman informed him about the shower that had previously been used, and also informed him that the employees were currently using buckets filled with water to wash their hands. Bannick saw these buckets in the basement and was unsure "what the source of water was." Bannick testified that water in buckets is not clean because "[t]hat's standing water that's becoming progressively more contaminated depending on the number of individuals that are using it." Bannick did not see any other hand washing facilities during his inspections, nor did he observe any employees washing their hands.

When Bannick conducted his first inspection, work on the shooting range had been completed, and the shower for that area had been removed. Bannick did observe "evidence of shower stalls for decon" on site. Bannick's understanding was "that showers were present and set up for different aspects of the job, but that a shower was not always up, available, operational to be used in the fashion of a hand washing facility at all times for employees during breaks."

After considering all of the aforementioned testimony, the Industrial Appeals judge issued a proposed decision on June 14, 2012. The judge found

---

[3] Bannick did not remember the conversation, but could not say that he never said such a thing.

- 5 -

that "PAS employees were not given access to hand washing facilities which met

the requirements of WAC 296-155-140." Finding of Fact 5. In the proposed

decision, the judge explained her reasoning as follows:

> If the point of having hand washing facilities is, as Mr. Bannick testified, to prevent employee ingestion of lead during breaks and after hours, the requirement that employees take the time to fully undress and shower before taking minor breaks to use the restroom, get water, or have a cigarette does not meet this need.
>
> Further, the evidence conflicted as to whether or not showers were even provided. This is not surprising, given the level of movement taking place at the Armory during that time period. . . . Showers were moved depending upon where they were needed in the building.
>
> Although the testimony is mixed as to whether the showers even worked, the testimony did establish that employees would use buckets, tubs, hoses, hotsy sprayers or a combination thereof to wash their hands when showers weren't present or working properly. Because I agree with Mr. Bannick that standing bucket water becomes progressively more contaminated depending upon the number of individuals using it (or, indeed, even as one individual uses it), I cannot find that these "alternatives" met the strict (and mandatory) requirements set forth in the WAC. Accordingly, I find that PAS violated WAC 296-155-17619(5)(a) by failing to provide hand washing facilities which complied with its requirements.

The judge further found that the violation was serious. The judge thus

concluded that "PAS committed a serious violation of WAC 296-155-

17619(5)(a)." Conclusion of Law 3.

PAS filed a petition for review with the Board on July 26, 2012. The

Board denied PAS's petition and adopted the judge's proposed decision in

full.

PAS appealed to the Whatcom County Superior Court. The superior court

upheld the Board's determinations in all respects. PAS was ordered to pay a civil

penalty of $400 and a statutory attorney fee of $200.

PAS appeals.

II

PAS challenges the Board's Finding of Fact 5, that it failed to provide adequate hand washing facilities, contending that this finding is not supported by substantial evidence. PAS contends that the testimony of certain PAS employees is inconsistent with the factual finding that it did not provide adequate hand washing facilities. PAS also asserts that showers suffice as adequate hand washing facilities. Neither contention has merit.

"We review a decision by the BIIA directly, based on the record before the agency." J.E. Dunn Nw., Inc. v. Dep't of Labor & Indus., 139 Wn. App. 35, 42, 156 P.3d 250 (2007) (citing Legacy Roofing, Inc. v. Dep't of Labor & Indus., 129 Wn. App. 356, 363, 119 P.3d 366 (2005)). "We review findings of fact to determine whether they are supported by substantial evidence." J.E. Dunn, 139 Wn. App. at 42 (citing Inland Foundry Co. v. Dep't of Labor & Indus., 106 Wn. App. 333, 340, 24 P.3d 424 (2001)). Substantial evidence is that which is "in sufficient quantum to persuade a fair-minded person of the truth of the declared premise." Holland v. Boeing Co., 90 Wn.2d 384, 390-91, 583 P.2d 621 (1978). We review findings of fact in light of the record as a whole. J.E. Dunn, 139 Wn. App. at 43. "Because we give deference to an agency's factual findings in its area of expertise, we will uphold the Board's findings unless they are clearly erroneous." Wash. Cedar & Supply Co. v. Dep't of Labor & Indus., 119 Wn. App. 906, 914, 83 P.3d 1012 (2004). This standard of review does not contemplate

that we will "undertake an evaluation of the credibility of witnesses" or "engage in a weighing and balancing of conflicting evidence." Gogerty v. Dep't of Institutions, 71 Wn.2d 1, 8, 426 P.2d 476 (1967).

The Department bears the burden of proving that a violation occurred. Mowat Constr. Co. v. Dep't of Labor & Indus., 148 Wn. App. 920, 924, 201 P.3d 407 (2009). In order to prove that a violation occurred, the Department must show that:

> (1) the cited standard applies; (2) the requirements of the standard were not met; (3) employees were exposed to, or had access to, the violative condition; and (4) the employer knew, or through the exercise of reasonable diligence could have known, of the violative condition.

Mowat, 148 Wn. App. at 924 (citing SuperValu, Inc. v. Dep't of Labor & Indus., 158 Wn.2d 422, 433, 144 P.3d 1160 (2006)).

WAC 296-155-17619(5)(a) states, "The employer shall provide adequate handwashing facilities for use by employees exposed to lead in accordance with WAC 296-155-140." WAC 296-155-140 states, in relevant part, "Clean, tepid wash water, between 70 and 100 degrees Fahrenheit, shall be provided at all construction sites." WAC 296-155-140(2)(a). The Board found that PAS had violated these administrative provisions because employees were washing their hands in buckets, and standing water in buckets is not clean water. PAS does not dispute that standing water in buckets is not clean. Rather, it contends that the testimony does not support a finding that buckets were the primary means by which employees could wash their hands.

However, substantial evidence supports the Board's finding of fact. Arita

and Santiago both testified that they washed their hands in buckets. Both Bannick and Hansen observed buckets set up as hand washing facilities. Cantu testified that employees washed their hands in a tub with no running water, and that employees used the same tub to wash their equipment.

As PAS notes, there was some testimony to the contrary. Santiago testified that there was a "hotsy" sprayer that emptied into a tub. Cantu testified that there was a washing station operated by foot pump on the first floor. However, "substantial evidence" does not mean "the only evidence." "It is for the trier of fact to assess the credibility and weight to be attached to the evidence, [and] to measure that evidence in the light of applicable legal requirements and presumptions." Cook v. Cook, 80 Wn.2d 642, 646, 497 P.2d 584 (1972). Here, several witnesses testified that employees used buckets to wash their hands. Further, Cantu testified that employees washed their hands in a tub that was also used to wash equipment. The Board gave more weight to the evidence that the employees used buckets to wash their hands than to the scattered testimony about sprayers and foot operated washing facilities. We will not disturb the Board's determination.

PAS further contends that WAC 296-155-17619(5)(a) is a "performance standard" and, as such, PAS should be afforded leeway in deciding how to comply with the regulation. Thus, PAS asserts, it can use showers instead of other hand washing facilities if it so chooses. PAS relies on Sec'y of Labor v. Thomas Indus. Coatings, Inc., 21 O.S.H. Cas. (BNA) 2283, 2007 WL 4138237 (O.S.H.R.C. Nov. 1, 2007), in support of this contention. In that case, the

Occupational Safety Health Review Commission differentiated between "performance standards" and "specification standards." Thomas Indus. Coatings, 2007 WL 4138237 at *4. This distinction is irrelevant to the case at hand, because PAS's contention fails regardless. Under federal law, performance standards "are interpreted in light of what is reasonable." Thomas Indus. Coatings, 2007 WL 4138237 at *4. Here, the Board found that it was not reasonable to expect employees to use showers to wash their hands whenever they took a short break. Thus, even if PAS had discretion in deciding how to comply with WAC 296-155-17619(5)(a), the Board's findings preclude a conclusion that PAS acted lawfully.

The Board's Finding of Fact 5 is supported by substantial evidence.

III

In the alternative, PAS contends that the Board erred by concluding that its violation of WAC 296-155-17619(5)(a) was serious. This is so, it asserts, because PAS's provision of showers provided equal or greater protection than would have been provided by strict compliance with the administrative regulation. We disagree.

"The standard for a 'serious' violation is whether there is 'a substantial probability that death or serious physical harm could result.'" Mowat, 148 Wn. App. at 929 (quoting RCW 49.17.180(6)). "Substantial probability" is defined as "the likelihood that, should harm result from the violation, that harm could be death or serious physical harm." Lee Cook Trucking & Logging v. Dep't of Labor & Indus., 109 Wn. App. 471, 482, 36 P.3d 558 (2001). Here, Bannick testified

- 10 -

that exposure to lead can result in "impact on . . . the blood forming systems,"
"reproductive hazards," and "neurological damage." No evidence to the contrary
was offered. Thus, the Department met its burden to prove that the violation was
serious.

Nevertheless, PAS contends that Phoenix Roofing, Inc. v. Dole, 874 F.2d
1027 (5th Cir. 1989), mandates that the violation be classified as general. This is
so, it asserts, because showers provide an equal, if not better, quality of
protection than what is mandated by WAC 296-155-17619(5)(a). Phoenix
Roofing does not support PAS's contention.[4]

In Phoenix Roofing, the employer was cited for violation of a regulation
requiring that a motion stopping device at the edge or a warning line six feet from
the edge be used when employees worked on a roof more than 50 feet wide.
874 F.2d at 1029-30. Instead of a motion stopping device or warning line, the
employer used two experienced employees whose sole duty was to warn
workers when they ventured too close to the roof's edge. Phoenix Roofing, 874
F.2d at 1030. Pursuant to federal regulations, monitors are permitted only when
the roof is less than 50 feet wide, or when employees are "working within 6 feet
of the edge where only a warning line is in place." Phoenix Roofing, 874 F.2d at
1030. The administrative law judge found that this constituted a serious violation.
Phoenix Roofing, 874 F.2d at 1032.

In reversing the administrative law judge, the appellate court noted that:

---

[4] The Department contends that we rejected the Fifth Circuit's analysis in our decision in
Mowat. Contrary to its assertion, this court in Mowat did not reject Phoenix Roofing, but rather
distinguished that case on its facts. 148 Wn. App. at 931.

There are, conceptually, at least three circumstances under which a violation may be considered *de minimis*: (1) Where no injury will result, or any injury will be minor; (2) where the possibility of injury is remote; or (3) where there is no significant difference between the protection provided by the employer and that which would be afforded by technical compliance with the standard.

Phoenix Roofing, 874 F.2d at 1032 (footnotes omitted). The facts in that case established that "the citation was based only upon the compliance officer's observation of employees working near the edge of the roof who, under the regulations, could have been protected by monitors. The additional presence of a warning line would be only for the protection of employees working further from the perimeter." Phoenix Roofing, 874 F.2d at 1032. Under those circumstances, the use of monitors "provided safety equal to or greater than that imposed by regulation." Phoenix Roofing, 874 F.2d at 1032. The court thus held that because the monitoring used by the employer did not "appreciably diminish" the safety of its workers, the violation must be classified as de minimis. Phoenix Roofing, 874 F.2d at 1033.

The employer bears the burden of proving that it did not appreciably diminish the safety of its workers. Hackney, Inc. v. McLaughlin, 895 F.2d 1298, 1300 (10th Cir. 1990). Unlike in the employer in Phoenix Roofing, PAS did not meet this burden. While Cantu and Santiago testified that they took a shower when they left the shooting range, they did not testify that they used the shower to wash their hands on other occasions. No testimony was presented establishing that the employees used the showers after the work on the shooting range was completed. Finally, as the Board found, showers do not serve the

purpose of WAC 296-155-17619(5)(a), because an employee is unlikely to take a shower when taking only a short work break.

Substantial evidence does not establish that the showers at the armory "provided safety equal to or greater than that imposed by regulation." See Phoenix Roofing, 874 F.2d at 1032. Accordingly, the Board did not err by concluding that the violation was serious.

Affirmed.

We concur: