# IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

POTELCO, INC.,

                Appellant,

v.

WASHINGTON STATE DEPARTMENT
OF LABOR & INDUSTRIES,

                Respondent.

No. 73735-0-I

DIVISION ONE

UNPUBLISHED OPINION

FILED: March 7, 2016

LEACH, J. — Potelco Inc. challenges a Board of Industrial Insurance Appeals (Board) decision affirming its citation for two serious violations. After an employee was injured in a work site accident, the Department of Labor and Industries (Department) cited Potelco for allowing two unqualified employees to work near a high-voltage transmission line and failing to hold a safety meeting when work site hazards changed. The Board found facts supporting those citations, and the trial court found that substantial evidence supported the Board's findings. Because we agree, we affirm.

## Background

Potelco Inc. appeals a trial court order affirming a Department citation. The Department cited Potelco after an accident that occurred in June 2012 as Potelco replaced a high-voltage transmission line for Puget Sound Energy. Potelco was dismantling an existing 115,000-volt transmission line, Baker line 2,

from the generating plant at Baker Dam to a substation 24 miles away in Sedro Woolley. This required taking down and rebuilding the structures that supported the line. A second line, Baker line 1, ran parallel to Baker line 2 and during the project remained energized with 115,000 volts. For most of their length, the lines ran parallel, about 60 feet apart. Where the lines turned, however, they came closer together.[1]

Before beginning work on the project, Potelco surveyed the area. It knew where to build each of the new structures because Puget Sound Energy had designated the locations of the structures and their anchor points. Some structures were inaccessible by road, so Potelco had to arrange for a helicopter to fly in materials for constructing the new structures. It used the services of Salmon River Helicopters on two days, June 25 and June 26, 2012.

On June 26, a Potelco civil crew was building "structure 4/3" at a point where Baker lines 1 and 2 turned. To do so, the crew had to build three anchors to support the structure. This required digging three anchor holes by hand and filling them with gravel and concrete. The helicopter flew these materials in at the end of a "long line." The long line carried concrete in an aluminum hopper. The last hole to be filled, anchor hole A, was so close to the energized Baker line 1 that the long line would come within five feet four inches of it. This was the

---

[1] The Board's unchallenged findings of fact are verities on appeal. See Robel v. Roundup Corp., 148 Wn.2d 35, 42, 59 P.3d 611 (2002).

closest to Baker line 1 that any Potelco worker had to work while a helicopter was in use.

The long line "was either made of, or wrapped in, Kevlar and had an extension cord inside of it" to allow the helicopter to drop the load in an emergency. Both the aluminum hopper and the long line were conductive.

When the helicopter approached for the last drop of the day on June 26, two Potelco civil employees, Shane Wheeler and Alan Jesmer, were there to receive it. As Wheeler went to unload the concrete, the long line touched Baker line 1. When Wheeler then touched the aluminum hopper, he received an electric shock. He suffered serious injuries and spent two weeks in a burn unit.

Because Potelco did not challenge the above findings, they are verities on appeal.[2]

After the Department investigated the accident, it cited Potelco for four violations of the Washington Industrial Safety and Health Act of 1973 (WISHA), chapter 49.17 RCW, regulations, with penalties totaling $21,000.[3] This appeal involves two alleged serious violations: (1) failing to hold a conference when a

---

[2] Robel, 148 Wn.2d at 42.

[3] The citation described 4 violations:
- Item No. 1-1A: A serious violation of WAC 296-45-055(5) with a penalty of $7,000;
- Item No. 1-1B: A serious violation of WAC 296-45-065(1) with no penalty;
- Item No. 1-2: A serious violation of WAC 296-45-67507(2) with a penalty of $7,000; and
- Item No. 1-3: A serious violation of WAC 296-45-325(1) with a penalty of $7,000.

change in hazards occurred and (2) failing to ensure that only qualified employees worked "on or near conductive objects brought into close proximity of high voltage lines."

Potelco appealed to the Board. The Board found the following facts:

Potelco has two classes of workers: journeymen linemen trained to work on and close to energized lines and civil workers who perform excavation and construction but have little knowledge of electrical work. Potelco gave civil workers training "of limited duration," which "basically trained the civil workers to stay away from energized lines." It did not teach them "how to work on energized lines or how to protect themselves from hazards posed by working in close proximity to energized electrical lines."

"Potelco either knew or, through the exercise of reasonable diligence, could have known that the long line" could conduct electricity.

"Potelco either knew or, through the exercise of reasonable diligence, could have known, that . . . neither Mr. Wheeler nor Mr. Jensen were . . . trained to be working where they were." In particular, neither was

> trained in the skills and techniques necessary . . . to determine the nominal voltage of exposed live parts, the minimum approach distances corresponding to the voltages to which they were exposed, and the proper use of the special precautionary techniques, personal protective equipment, insulating and shielding materials, and insulated tools for working on or near exposed energized parts of electrical equipment.

The work at structure 4/3 was a change in hazards for Potelco's workers because that structure was so much closer to Baker line 1 than other locations

where Potelco had worked with a helicopter with a conductive long line. Potelco either knew or could have known this, and it should have held a conference before work started to make sure all workers understood the hazards they would face and precautions they needed to take.

Finally, Wheeler and Jesmer "did not have the training to appreciate the hazards, and were not utilizing personal protective equipment that could have reduced the hazards."

The Board found two violations occurred, found two other alleged violations did not, and reduced the penalty to $14,000.

Potelco appealed to the trial court, which found that substantial evidence supported all the challenged Board findings of fact. The trial court adopted the Board's conclusions of law as its own and affirmed its order. Potelco appeals.

## Analysis

WISHA governs judicial review of a Board decision.[4] This court directly reviews that decision based on the record before the Board.[5] The Board's findings of fact are conclusive if they are supported by substantial evidence when viewed in light of the record as a whole.[6] Substantial evidence is evidence sufficient to persuade a fair-minded person of the truth of the matter asserted.[7] We view this evidence in the light most favorable to the party that prevailed in

---

[4] RCW 49.17.150(1).
[5] Mowat Constr. Co. v. Dep't of Labor & Indus., 148 Wn. App. 920, 925, 201 P.3d 407 (2009).
[6] RCW 49.17.150(1); Mowat Constr. Co., 148 Wn. App. at 925.
[7] Mowat Constr. Co., 148 Wn. App. at 925.

front of the Board—here, the Department.[8]  If this court determines that substantial evidence supports the Board's findings, it then decides if those findings support the Board's conclusions of law.[9]

Potelco challenges nine findings of fact and five conclusions of law, asserting that the record lacks substantial evidence for these findings, making the conclusions of law wrong.  Because the record contains substantial evidence to support each of the challenged findings of fact and those findings of fact support the conclusions of law, we affirm.[10]

Employee Qualifications

Potelco contends Wheeler and Jesmer were trained in electrical safety and understood the hazards they faced.  It asserts, by implication, that substantial evidence does not support the Board's findings that Potelco's workers were inadequately trained to work and protect themselves from those hazards.

WAC 296-45-325(1) provides, "[o]nly qualified employees may work on or with exposed energized lines or parts of equipment" or "in areas containing unguarded, uninsulated energized lines or parts of equipment operating at 50 volts or more."  WAC 296-45-035 defines a "qualified employee" as one who, among other attributes, is "familiar with the construction of, or operation of such lines and/or equipment that concerns his/her position and . . . fully aware of the

---

[8] Frank Coluccio Constr. Co. v. Dep't of Labor & Indus., 181 Wn. App. 25, 35, 329 P.3d 91 (2014).
[9] J.E. Dunn Nw. Inc. v. Dep't of Labor & Indus., 139 Wn. App. 35, 42, 156 P.3d 250 (2007).
[10] Potelco has waived any argument that the Board's findings of fact, if true, do not support its conclusions of law.  RAP 10.3(a)(6).

hazards connected therewith."[11] And WAC 296-45-065(1) requires that a "qualified employee" must <u>also</u> "be trained and competent in" certain skills and techniques, including distinguishing exposed live parts from other parts of electrical equipment, determining those parts' nominal voltage, determining minimum approach distances for particular voltages, and using "the special precautionary techniques, personal protective equipment, insulating and shielding materials, and insulated tools for working on or near exposed energized parts of electric equipment."[12]

Potelco asserts that the Department cited it "solely because Wheeler was not a lineman." It contends that not only a lineman but any employee who understands the hazards of his position satisfies the definition of a qualified employee under the circumstances. It points out that Wheeler knew line 1 was energized at 115,000 volts, knew the minimum approach distance for a 115,000-volt line, and understood that he should not work with any conductive object within that distance. Potelco asserts that Wheeler's alleged lack of training did not prevent him from recognizing the hazard; Salmon River's representation that the long line was nonconductive did.

Both the record and the text of the WISHA regulations contradict these assertions. Potelco incorrectly claims that any employee who understands the

---

[11] Potelco concedes that Wheeler and Jesmer did not satisfy the other way to be "qualified" under this regulation, to pass a journey status examination. WAC 296-45-035.

[12] <u>See also</u> WAC 296-45-035 ("An employee must have the training required by WAC 296-45-065(1) in order to be considered a qualified employee.").

hazards of his position is a "qualified employee." WAC 296-45-065(1) contains four specific training and competency requirements that Wheeler and Jesmer admitted they did not meet. Wheeler and Jesmer each admitted to a lack of awareness of the hazards posed by the long line coming near the energized Baker line 1. They admitted they did not know how to determine the nominal voltage of a live line. And they admitted they did not know how to use insulating and shielding materials or insulated tools when working near an exposed energized wire. Wheeler and Jesmer's testimony thus shows they did not satisfy the regulatory definition of "qualified employee" and were not "fully aware of the hazards connected" with the energized transmission line they were working near. Thus, substantial evidence supports the Board's finding that Wheeler and Jesmer "were not trained to be working where they were."

Knowledge of Long Line's Conductivity

Next, Potelco challenges the Board's finding that it "either knew or, through the exercise of reasonable diligence, could have known that the long line . . . was conductive." It contends that it reasonably relied on Salmon River's "assurances" that its long line was not conductive.

Under WISHA, "a serious violation cannot exist if . . . the employer did not actually know of <u>the presence of the violation</u> or . . . the employer <u>could not with the exercise of reasonable diligence</u> have known of the presence of the

violation."[13]  "'Reasonable diligence involves several factors, including an employer's obligation to inspect the work area, to anticipate hazards to which employees may be exposed, and to take measures to prevent the occurrence.'"[14]

Potelco's challenge to the Board's knowledge finding lacks merit. First, even if Potelco had a "valid reason" to think the long line was nonconductive, that would not by itself negate the Board's finding that with reasonable diligence, Potelco could have discovered the truth. RCW 49.17.180(6) imposes a duty to inspect. Potelco cites no authority for its contention that its unquestioning reliance on a contractor's statement meant it could not know of violative conditions. In effect, Potelco's interpretation would "render[ ] the phrase 'and could not with the exercise of reasonable diligence' superfluous" in cases where an employer claims reliance on a third party's statement.[15] This would conflict with our practice of "constru[ing] WISHA statutes and regulations liberally to achieve their purpose of providing safe working conditions."[16]

Second, viewed in the light most favorable to the Department, the record does not support Potelco's contentions that it reasonably relied on a statement by the Salmon River pilot. The "assurance[ ]" Potelco points to is the pilot's alleged statement at a meeting on June 25 that the long line was made of Kevlar,

---

[13] BD Roofing, Inc. v. Dep't of Labor & Indus., 139 Wn. App. 98, 108, 161 P.3d 387 (2007); RCW 49.17.180(6).

[14] Erection Co. v. Dep't of Labor & Indus., 160 Wn. App. 194, 206-07, 248 P.3d 1085 (2011) (internal quotation marks omitted) (quoting Kokosing Constr. Co. v. Occupational Safety & Hazard Review Comm'n, 232 F. App'x 510, 512 (6th Cir. 2007)); see also RCW 49.17.180(6).

[15] BD Roofing, 139 Wn. App. at 108; see also RCW 49.17.180(6).

[16] Frank Coluccio Constr. Co., 181 Wn. App. at 36.

a nonconductive material. Neither Wheeler nor Jesmer heard this statement, and neither claimed to know the rope's material. And Potelco offered no evidence that it inquired into the conductivity of the long line. The manager of its civil division, Eric Holmgren, said he did not know if anyone tested the long line for conductivity. He also acknowledged that a lineman should make the determination of whether or not an object that will come near an energized power line conducts electricity. Yet Potelco offered no evidence that the pilot was a lineman or had any electrical safety training. Thus, even assuming that reasonable reliance on a subcontractor would negate the "reasonable diligence" requirement, the record does not indicate that Potelco's employees reasonably relied on the Salmon River pilot's statements.

Instead, the record shows Potelco could have known the long line was conductive had it made a reasonable inquiry. First, Potelco is in the business of installing electrical facilities; it is reasonable to assume that it knows how to tell if a line is conductive. Second, Holmgren acknowledged that a lineman should determine if an object that would be near an energized line conducts electricity. Third, Holmgren testified that he knew Kevlar becomes conductive when dirty. Even if dirtiness was not in fact the reason the long line was conductive, the likelihood of dirtiness "after two days of work delivering gravel and concrete in a

muddy location" was enough to render unreasonable Potelco's assumption that the line was nonconductive.[17]

Potelco cites a decision by the Office of Safety Health Review Commission, Imperial Aluminum,[18] stating, "In many situations in the workplace, it is natural for an employer to rely upon the specialist to perform work related to that specialty safely in accordance with OSHA standards." In that case, "[t]he cited hazard was the result of operator error on the part of the outside Contractor."[19] The employer "reasonably relied" on the contractor to safely perform its contracted tasks.[20]

This federal administrative decision does not aid Potelco. Here, the cited hazards came not from the contractor's performance but from circumstances Potelco knew of or should have known about the closeness of the work site and helicopter line to Baker line 1, the long line's specifications, and Potelco workers' lack of qualifications. Moreover, it was not "natural," in this situation, to rely on the outside contractor's expertise because Potelco had the expertise about electrical work.[21]

---

[17] The Board did not make a fact finding that the line was dirty or that dirtiness made it conductive. Rather, the Board found that the line had an extension cord inside of it, that it was conductive, and that Potelco knew or, with reasonable diligence, could have known it was conductive.

[18] 24 BNA OSHC 2081 (No. 12-1129, 2013) (ALJ), 2013 WL 6911242, at *9 (emphasis added).

[19] Imperial Alum., 2013 WL 6911242, at *7.

[20] Imperial Alum., 2013 WL 6911242, at *8.

[21] Potelco also claims that no evidence supports the Board's statement that Salmon River and Potelco had a contract describing the long line's specifications. Though that statement does appear to be unsupported, the Board did not include it in its findings of fact. And the Board had other facts on which to

Change in Hazard

Potelco also challenges the Board's finding that the work on structure 4/3 was a change in hazard due to the structure's closeness to Baker line 1. Potelco asserts that the Board therefore erred in concluding that Potelco violated WAC 296-45-67507(2).

That regulation requires that whenever a "change in the hazards" of a job occurs, "a conference shall immediately be held at which time all affected employees . . . will be advised of such hazards or change of operation." Potelco held a meeting the day before the accident to address general safety issues in working with a helicopter, but that meeting did not discuss electrocution risks or any potential hazard from a long line coming close to or touching an energized line.

Potelco does not contend that it held a conference before working on structure 4/3. Instead, it contends that the work at structure 4/3 was not a change in hazard because Salmon River delivered materials to other angled structures before delivering to structure 4/3. It also points out that "every structure, whether straight or angled, was in the 'vicinity' of line No. 1."

While true, these facts miss an important point. The Board based its "change in hazards" finding not only on the angle of the turn but, more importantly, on the work site's closeness to Baker line 1.[22] Structure 4/3 was

---

base its conclusion that Potelco knew or could have known of its violations. To the extent the Board's statement was erroneous, that error was harmless.

[22] Finding of fact 5 provides in part:

closer to Baker line 1 than any other place Potelco worked while a helicopter was in use.[23] That fact alone provides substantial evidence of a change in hazard. We reject Potelco's challenges to the Board's "change in hazards" finding.

Potelco further contends that even if it faced a change in hazards, it did not know of that change and could not have known "through the exercise of reasonable diligence." Again, it supports its argument with its alleged reliance on Salmon River's statement that the long line was nonconductive. Since the energized line was high in the air, Potelco reasons, the horizontal closeness of that line to anchor hole A would not matter if the long line was actually nonconductive. But, as we said earlier, the record supports the Board's finding that with reasonable diligence Potelco could have known the long line conducted electricity. Since Potelco also knew the relative locations of anchor hole A and Baker line 1 before starting work, the record contains substantial evidence that Potelco knew or could have known of this change in hazards.

Remaining Assignments of Error

Finally, Potelco generally challenges several of the Board's findings of fact and conclusions of law because "substantial evidence shows that Potelco did not

---

> The last anchor hole . . . .was located at a point so that the aluminum hopper . . . could be as close as five feet four inches from Baker line 1 . . . , which was the closest point that any Potelco worker had to work to Baker line 1 while a helicopter was used.

[23] Potelco contests this fact only in a footnote in its reply brief, and the record does not support its argument. Potelco cites testimony by Holmgren that simply states Potelco worked at other angled structures during the project, a fact not in dispute. Moreover, Holmgren's testimony shows that he did not know how close structure 4/3 was to Baker line 1.

violate the cited standards." Potelco's only arguments in support of these assignments of error again relate to its knowledge of the long line's conductivity. As we have said, the record contains substantial evidence that with reasonable diligence Potelco could have known that the long line was conductive. We therefore reject Potelco's remaining assignments of error.[24]

## Conclusion

The record contains substantial evidence of these findings. Potelco employees Wheeler and Jesmer lacked the competence and training that WISHA regulations require and so were not qualified to do the work they were doing when Wheeler was injured. With reasonable diligence, Potelco could have known the helicopter's long line was conductive, contrary to the helicopter pilot's alleged statement. The work site where the accident occurred was closer to an energized transmission line than any other project site where Potelco worked

---

[24] Potelco makes no argument that the circumstances surrounding the accident were not "likely to result in death, injuries involving permanent severe disability or chronic, irreversible illness." Nor does it make an argument that the Board's finding that Potelco did not cooperate with the inspection and showed poor good faith effort to comply with the regulations was unsupported. Potelco thus waived its challenges to findings of fact 13 and 15. RAP 10.3(a)(6); Lodis v. Corbis Holdings, Inc., 172 Wn. App. 835, 862, 292 P.3d 779 (2013) (declining to consider unsupported argument).

with a helicopter. Thus, that work at that site presented a change in hazards. These findings, in turn, support the Board's conclusions of law. We affirm.

_Leach, J._

WE CONCUR:

_Spearman, C.J._          _Appelwick, J._